# In the United States Court of Federal Claims

No. 18-856C
(Filed Under Seal: March 11, 2019)
(Reissued for Publication: March 25, 2019)*

```
*************************************
 CITIZANT, INC.,                     *
                                     *
            Plaintiff,               *
                                     *
 v.                                  *   Postaward Bid Protest; RCFC 52.1;
                                     *   Cross-Motions for Judgment;
 THE UNITED STATES,                  *   Failure to Follow Solicitation Requirements;
                                     *   Technical Evaluation; Cost/Price Evaluation
            Defendant,               *
                                     *
 and                                 *
                                     *
 HALVIK CORP.,                       *
                                     *
            Defendant-Intervenor.    *
*************************************
```

Tenley A. Carp, Washington, DC, for plaintiff.

Jeffrey D. Klingman, United States Department of Justice, Washington, DC, for defendant.

Alexander J. Brittin, McLean, VA, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

In this postaward bid protest, plaintiff Citizant, Inc. ("Citizant") alleges that the contracting officer ("CO") erred by not selecting it as an awardee in connection with a solicitation issued by the United States General Services Administration ("GSA") for information technology services. Specifically, Citizant claims that the CO improperly credited points for proposals submitted by other offerors and, but for that error, Citizant would have been selected as an awardee. Defendant and Halvik Corp. ("Halvik"), who intervened to defend its interest as an awardee, dispute Citizant's contentions. The court is presented with the parties'

---

   * The reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties on March 22, 2019. The redactions are indicated with bracketed ellipses ("[. . .]").

cross-motions for judgment on the administrative record. For the reasons explained below, the court denies defendant's motion, denies Halvik's motion, and grants Citizant's motion.

## I. BACKGROUND

### A. Solicitation

On June 20, 2016, the GSA issued solicitation QTA0016GBA0002 to procure information technology services for the government. Administrative R. ("AR") 4, 270. Specifically, the GSA sought proposals for the Alliant 2 Small Business Governmentwide Acquisition Contract, a multiple-award, indefinite-delivery, indefinite-quantity contract. Id. at 270. An awardee under the solicitation would become eligible to receive task orders performed under the contract. Id. at 262-63. The GSA specified that proposals were due by October 7, 2016. Id. at 258.

#### 1. Proposal Format and Contents

The GSA required that offerors submit their proposals in seven volumes: volume 1 – General; volume 2 – Relevant Experience; volume 3 – Past Performance; volume 4 – Systems, Certifications, and Clearances; volume 5 – Organizational Risk Assessment; volume 6 – Cost-Price; and volume 7 – Responsibility. Id. at 365. Citizant's protest concerns volumes 1, 4, and 6.

In volume 1, offerors needed to include, among other items, a completed copy of the Document Verification and Self Scoring Worksheet ("Scoring Worksheet"). Id. at 372. In the Scoring Worksheets, offerors were required to claim points for meeting specific criteria in the solicitation and then they were required to substantiate those points with supporting documents. Id.; see also id. at 179-80 (Scoring Worksheet).

In volume 4, offerors were required to include verification of an acceptable cost accounting system ("CAS") if they claimed the 5500 points for possessing an acceptable CAS on the Scoring Worksheet. Id. at 180. Specifically, to substantiate those points, offerors needed to

> provide verification from the Defense Contract Audit Agency [("DCAA")], Defense Contract Management Agency or any Cognizant Federal Agency [("CFA")] of an acceptable accounting system that has been audited and determined adequate for determining costs applicable to the contract or order in accordance with [Federal Acquisition Regulation ("FAR")] 16.301-3(a)(3).

Id. at 392. An offeror provided the necessary verification by submitting four pieces of information: (1) the contact information for its agency representative, (2) a letter from the auditing agency attesting that its CAS had been audited and determined adequate, (3) an averment that it had not materially changed its CAS since its last audit, and (4) its Dun & Bradstreet ("DUNS") number and Commercial and Government Entity ("CAGE") code. Id. In lieu of submitting the letter from the auditing agency, an offeror could submit a statement of

certainty in which it averred that it possessed an audited and adequate CAS.[1]  Id.  An offeror expressing such certainty to the CO triggered the CO's obligation to contact the auditing agency to verify that the offeror's CAS was acceptable, and the GSA agreed that it would only deduct the 5500 points "[i]f after reasonable efforts the [CO was] unable to obtain audit verification from the [auditing agency]."  Id. at 392.  Regardless of the verification method chosen by the offeror, it needed to submit the requisite materials in volume 4.  Id. at 368.

In volume 6, offerors were to include a completed "cost/price template" and a basis of estimate ("BOE").  Id. at 397.  The cost/price template was a spreadsheet in which offerors "propose[d] ceiling rates" for work that would be performed under the task orders.  Id.  Specifically, offerors were asked to identify their proposed profit, indirect labor,[2] and direct labor rates for the 248 job types—each identified by a contract line item number ("CLIN")—listed in the spreadsheet.[3]  Id. at 399 (discussing contents); id. at 207-09 (identifying the number of CLINs).  Those entries were used to calculate offerors' proposed fully burdened labor rates for each CLIN.  See id.  Offerors were encouraged to propose direct labor rates within the range that the GSA—relying on information from the United States Department of Labor—set forth in the solicitation ("DOL Range").[4]  Id. at 398; see also id. at 197-203 (setting forth a low-end and high-end direct labor rate for each CLIN).  In addition to the template with the proposed rates, offerors needed to provide a BOE containing "clear and concise explanations of their pricing methodology and their labor and burden estimating practice."  Id. at 396.  Specifically, offerors were required to explain how they computed their proposed profit, indirect, and direct labor rates.  Id.

## 2. Evaluation Process

The GSA explained in the solicitation that the awardees would be selected based on which offerors presented the highest technically rated proposals with a fair and reasonable price.  Id. at 402.  The GSA also noted that it would "strictly enforce all of the proposal submission requirements" and that the "[f]ailure to comply with [those] requirements [would] result in an

---

[1]  The contours of the statement of certainty were discussed in more detail in Dynanet Corp. v. United States, 139 Fed. Cl. 579 (2018), a decision on a bid protest arising from the same solicitation.

[2]  Indirect labor rates consisted of separate percentages for (1) overhead, (2) fringe benefits, and (3) general and administrative expenses.  AR 397.

[3]  The 248 CLINs reflected that offerors were asked to propose pricing for thirty-one labor categories, which were each divided into four subcategories based on skill level, for work performed at a government site, and separately propose pricing for the same work performed at the contractor's site.  AR 207-09.

[4]  The GSA mapped each position to the United States Department of Labor's Bureau of Labor Statistics ("BLS") Standard Occupational Classification System, and then used salary data from the BLS, as well as other sources, to determine a lower- and upper-bound direct labor rate for each position.  AR 398.

Offeror's proposal being rejected as being materially non-conforming to [the] solicitation requirements." Id.  The selection process consisted of three evaluation stages:  (1) technical, (2) pricing, and (3) responsibility.  See id. at 467.  Only the first two stages are at issue in this protest.

The first stage, a technical evaluation, involved identifying the eighty highest scoring proposals based on the points each offeror claimed and substantiated in its proposal.  To do this evaluation, the GSA set forth a structured review process that consisted of the following steps, which the CO was required to perform in the order noted:

- Step One:  The CO preliminarily identifies the top eighty proposals by sorting all of the submissions from the highest score to the lowest score based on the offerors' Scoring Worksheets.  Id. at 402-03.  The CO then reviews the top eighty proposals in accordance with the following steps.

- Step Two:  For each proposal, the CO verifies that a support document exists for all of the evaluation elements included on the Scoring Worksheet.  Id. at 403.  Any discrepancies at this stage are treated as clarifications.  Id.

- Step Three:  The CO conducts an acceptability review to determine whether each offeror submitted all of the requested information for the general volume in the specified manner.  Id.  If a proposal does not pass the review, the proposal is replaced by the next highest scoring proposal that passes the acceptability review.  Id.

- Step Four:  The CO determines whether a support document substantiates every claimed point on the Scoring Worksheet.  Id.  If the claimed points are not validated, then (1) those points are deducted, (2) the proposals are resorted based on the revised score, and (3) the proposal is replaced if its new score is below the cutoff for the top eighty proposals.  Id.

After identifying the eighty highest scoring proposals, the CO proceeded to the second stage:  determining whether those offerors proposed fair and reasonable pricing.  Specifically, the CO would use the information submitted in volume 6 to determine whether an offeror proposed a fully burdened rate for each labor category that was fair and reasonable.  Id. at 409.  The GSA would also examine whether the components of the fully burdened labor rate—i.e., the direct labor, indirect labor, and profit rates—were reasonable.  Id.  The GSA explained that the direct labor rates would be considered reasonable if they were within the DOL Range.  Id.  The indirect labor rates would be deemed reasonable if they reflected the offeror's "most current approved billing rates, forward pricing rate agreements, and/or acceptable accounting system generated rates" for each CLIN.  Id.  The profit rates would be found reasonable if they were no greater than 7.5%.  Id.  The GSA further explained that

> [i]f an Offeror does not meet one or more of these parameters for any labor category, the Offeror is strongly advised to provide clear and convincing rationale to support the proposed direct/indirect and/or profit rate(s).  In the event the

rationale is not determined reasonable, the proposal will be deemed to have a
maximum rate(s) that is not considered fair and reasonable and the proposal
would not be eligible for award, regardless of technical score.

Id.  If the CO concluded that the offeror did not provide fair and reasonable pricing, its proposal was removed from competition and replaced by the next highest scoring proposal outside of the top eighty.  Id. at 403.

The GSA explained that the process would continue until the top eighty proposals (or more, in the case of a tie for the last spot) were identified, at which point evaluations would cease and contracts would be awarded to the offerors of those proposals.  Id.  The CO, in the Source Selection Decision Memorandum ("SSD"), stated that he adhered to above process for evaluating proposals.  Id. at 466-68.

### B.  Proposals

#### 1.  Citizant

Citizant stated in its proposal that it was entitled to [. . .] points.  Id. at 2690.  The CO reviewed Citizant's proposal in accordance with the above procedures and confirmed that [. . .].  Id. at 10225-27.

When the GSA posted an award notice that included a list of the eighty-one awardees,[5] Citizant learned that it was not selected for an award.  Id. at 480-88.  Citizant promptly requested a debriefing.  Id. at 11201.3.  In a March 9, 2018 debriefing letter, the CO explained that Citizant's score placed it below the award cutoff; it received the [. . .] highest score in a solicitation that resulted in eighty-one awardees.  Id. at 11201.4-.6.  After it received the debriefing letter, Citizant filed a protest with the United States Government Accountability Office ("GAO").  Id. at 11115.  On May 22, 2018, the GAO dismissed the protest because protests concerning the same procurement were pending before this court.  Id. at 11243.

#### 2.  Relevant Offerors

Citizant's protest concerns purported errors that the CO made when evaluating proposals from offerors who were subsequently selected as awardees.  These offerors can be separated into two groups based on whether Citizant argues that they (1) failed to substantiate their CAS points or (2) submitted inadequate pricing information.[6]  Some offerors are part of both groups.

---

[5] The agency exceeded its stated target of eighty awardees as a result of a four-way tie for the seventy-eighth position.  AR 1615.

[6] Citizant initially pleaded claims concerning a third group but later agreed to waive those claims to expedite the resolution of this protest.

### a. Cost Accounting System

The first group consists of proposals submitted by twenty-one offerors who, according to Citizant, the CO improperly found validated the points they claimed for possessing an acceptable CAS (collectively, "Group One Offerors"). Of those twenty-one offerors, two—[. . .] ("[. . .]") and [. . .] ("[. . .]")—did not include their DUNS number and CAGE code in volume 4 of their proposals. Id. at 12307-19; 13476-506. [. . .] and [. . .], however, included the necessary information in the first volume of their proposals. Id. at 11247, 11261, 12464, 12474. The CO noted that both offerors submitted their DUNS number and CAGE code, id. at 13611, 13686, and then credited [. . .] and [. . .] with the points they claimed for possessing an acceptable CAS, id. at 13531, 13539.

Two other offerors—[. . .] ("[. . .]") and [. . .] ("[. . .]")—each attempted to validate their experience by submitting a letter from the DCAA addressing the adequacy of their incurred cost proposal ("ICP").[7] Id. at 14713, 14938. In those letters, the DCAA stated that each offeror's ICP was adequate and not selected for an audit. Id. The DCAA did not state, and the record does not reflect, what type of contract prompted the submission of the ICP. Id.; see also FAR 16.307(a)(1) (explaining, by reference to FAR 52.216-7, that ICPs are submitted for cost-reimbursement and time-and-materials contracts). Relying on those letters, the CO determined that both offerors had validated the points they claimed for their CASs. AR 16337, 16382. Specifically, with regard to [. . .], the CO explained that

> the offeror provided an incurred cost letter approval issued in conjunction with a cost reimbursement contract. The letter references two DCAA Audit Reports . . . . This evidence is sufficient to determine that the offeror has a cost accounting system that has been audited and determined adequate for cost reimbursement contracting.

Id. at 16337. As for [. . .], the CO stated that the

> [DCAA's] letter specifically deals with an incurred cost proposal and throughout the letter it references the results of an adequacy evaluation and determination of adequacy. This is evidence that the contractor is engaged in cost reimbursement contracts and the determination of accounting systems adequacy is a requirement of cost reimbursement contracts.

---

[7] An ICP is also referred to by other names such as "incurred cost submission," U.S. Enrichment Corp. v. United States, 121 Fed. Cl. 532, 533 (2015), and "final indirect cost rate proposal," FAR 52-216.7(d)(2)(i). Regardless of the nomenclature, the document is submitted after the government has been making interim payments to the contractor for costs incurred under certain types of contracts. U.S. Enrichment Corp., 117 Fed. Cl. at 551 (discussing FAR 52.216-7). The submission includes the contractor's proposed final indirect cost rates, which are used to determine a final rate and adjust the interim payments. Id.

Id. 16382.  He proceeded to award [. . .] and [. . .] the points they claimed for possessing an acceptable CAS.  Id. at 16337, 16382.

The other seventeen offerors in the first group did not include an averment in volume 4 addressing whether they had materially changed their CASs since their last audit.[8]  E.g., id. at 13716-50.  The CO, nonetheless, determined that each of those offerors validated the points they claimed for possessing an acceptable CAS.  E.g., id. at 10272.  He reached this conclusion by using an evaluation worksheet to confirm that the necessary elements were present.  E.g., id. at 10233 (noting that "[. . .]").  The evaluation worksheet, however, did not include a question regarding whether the offeror provided the necessary representation regarding material changes.  E.g., id. at 10524-29 (evaluation worksheet).  The CO also did not mention that requirement in the Technical Evaluation Summary when he recapped what points were validated, e.g., id. at 10233, or address the component anywhere in the materials created during the evaluation stage.

### b.  Pricing

The second group consists of five offerors—[. . .] ("[. . .]"); [. . .] ("[. . .]"); [. . .]; [. . .]; and [. . .] (collectively, "Group Two Offerors")—that Citizant argues were improperly deemed to have submitted fair and reasonable pricing.  Those offerors each submitted a complete volume 6 consisting of a BOE and cost/price template.  E.g., id. at 3214-89 ([. . .]).  In the BOE, each of the offerors stated that they were proposing direct labor rates within the DOL Range and indirect labor rates derived from their CASs.  E.g., id. at 3215-16.

The CO reviewed the Group Two Offerors' prices by first assessing the components of their proposed fully burdened labor rates for each CLIN.  E.g., id. at 10423-24 ([. . .]).[9]  He found their direct labor rates were reasonable because those rates were within the DOL Range.  E.g., id. at 10423.  He then determined that their indirect labor rates were reasonable because they were generated from the offerors' CASs or otherwise met the criteria set forth in the solicitation.  E.g., id. at 10423-44.  In addition, he concluded that the Group Two Offerors proposed reasonable profit rates because the rates were no more than 7.5% per CLIN.  E.g., id. at 10424.

After reviewing the components of the Group Two Offerors' proposed fully burdened labor rates, the CO addressed how he would evaluate those rates.  He stated that, in accordance with FAR 15.404-1(b)(2), he would assess the reasonableness of the rates by comparing them to the average prices proposed by offerors in response to the solicitation.  E.g., id. at 10424; see also FAR 15.404-1(b)(2)(i) (noting that comparing rates is an acceptable method for evaluating pricing).  Specifically, he explained that he had identified the average price proposed in response to the solicitation for each of the 248 CLINs and used that amount to determine a range of two

---

[8]  The seventeen offerors consist of [. . .].

[9]  The court only references the CO's analysis of [. . .] pricing, but he provided the same explanations for his conclusions regarding the other Group Two Offerors' prices.  Compare AR 10423-27 ([. . .]), with id. at 10428-31 ([. . .]), id. at 14032-35 ([. . .]), id. at 10436-39 ([. . .]), and id. at 16378-741 ([. . .]).

standard deviations above and below the average rate (the "Deviation Range") for each CLIN. E.g., AR 10425.  The CO calculated the average and Deviation Range from the rates proposed by eighty-seven offerors; in the spreadsheet that he used for his calculations, he excluded some awardees, omitted the rates proposed by many of the offerors, and double counted the rates proposed by two offerors.[10]  Id. at 16654-723; see also id. at 480 (noting that 493 offerors submitted proposals).  The CO then noted that he would use the Deviation Range to "highlight significant inconsistencies" in offerors' proposed pricing; if an offeror proposed a price outside that range, he would give further consideration to the price rather than treating it as per se unreasonable.  E.g., id. at 10425.

Applying the above framework, the CO assessed the Group Two Offerors' proposed fully burdened labor rates.  He acknowledged that each of those offerors proposed some rates within the Deviation Range and some rates outside that range.  E.g., id.  The CO did not use the same averages and ranges when making those assessments for each proposal; for various CLINs, he identified at least two different averages and upper bounds of the Deviation Range.  Compare id. at 16654-723 (noting averages and Deviation Ranges in a spreadsheet), with id. at 16740 (comparing pricing proposed by [. . .] to averages and Deviation Ranges that are different than those in the spreadsheet).  Specifically, when reviewing [. . .] proposal, he recognized averages and upper bounds for [. . .] CLINS that were different than the amounts he used when assessing other offerors' proposed rates for the same CLINs.[11]  See id. at 16654-723, 16740.  Without acknowledging that discrepancy, the CO deemed reasonable the Group Two Offerors' fully burdened labor rates within the Deviation Range because those rates were comparable to other prices submitted in response to the solicitation.  E.g., id. at 10425.  He also found reasonable the Group Two Offerors' fully burdened labor rates that were outside the Deviation Range because those rates were based on direct and indirect labor rates that he previously deemed reasonable. E.g., id. at 10425-26.  The CO concluded that, in light of the above considerations, each of the Group Two Offerors proposed fair and reasonable pricing.  E.g., id. at 10427.

## C. Procedural History

Citizant filed its protest in this court on June 18, 2018.  After Citizant filed its complaint, Halvik moved to intervene to defend its receipt of a contract against the allegations that the CO

---

[10] Despite being awardees, Teracore and Valador are not listed in the spreadsheet that the CO used to calculate the average and Deviation Range for each CLIN.  See AR 16654-723. Furthermore, the CO double counted rates proposed by Technology Solutions Provider and Innovative Management Concepts; those offerors were listed under their names and again under their abbreviated names.  Compare id. at 16656 (TSPi), and id. at 16657 (IMC), with id. at 16657 (Technology Solutions Provider and Innovative Management Concepts).

[11] For example, the spreadsheet that the CO used to calculate the averages and Deviation Ranges reflects that the average price for one of CLINs was $[. . .] and that the upper bound of the Deviation Range for that CLIN was $[. . .].  AR 16660.  In his analysis of [. . .] pricing, however, the CO identified the average price for the same CLIN as $[. . .] and the upper bound as $[. . .].  Id. at 16740.

improperly evaluated its proposal. Citizant subsequently filed two amended complaints. In its operative complaint, Citizant alleges that the CO improperly evaluated some awardees' technical components, proposed pricing, and responsibility. Specifically, Citizant pleads that the CO failed to properly

- evaluate documentation that twenty-one awardees—the Group One Offerors—submitted in support of the points they claimed for possessing an acceptable CAS; and

- assess the fully burdened labor rates of five awardees—the Group Two Offerors.[12]

Absent those errors, Citizant alleges that it—as the [. . .] unsuccessful offeror—would have received a contract because the aforementioned awardees would be ineligible for a contract. Citizant requests that the court (1) direct the GSA to establish a new list of awardees after correcting the errors the CO made in the initial evaluation, (2) order the GSA to award a contract to Citizant, and (3) award Citizant its costs and attorney's fees.

Pursuant to the schedule the parties proposed, they briefed cross-motions for judgment on the administrative record, and the court heard argument on December 7, 2018. Following oral argument, the parties filed supplemental briefs.[13] The motions are now ripe for adjudication.

## II. LEGAL STANDARDS

In ruling on motions for judgment on the administrative record pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly

---

[12] The court has omitted allegations regarding withdrawn claims. See supra note 6.

[13] In its supplemental brief, Citizant asserted (among other contentions) that the court should supplement the administrative record with (1) a declaration regarding the CO's pricing analysis and (2) an electronic-mail message concerning claims that were withdrawn after the supplemental brief was filed. Citizant, however, never filed a separate motion requesting such relief. Even if the relevant portion of the supplemental brief was construed as such a motion, Citizant fails to demonstrate that the aforementioned documents are necessary for effective judicial review of the pending claims. See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (permitting supplementation only if the moving party shows that doing so is necessary for effective judicial review). Indeed, as will be discussed below, the court can effectively review the CO's decision regarding his pricing evaluation without analyzing materials outside the record. See infra Section III.B (analyzing pricing claims).

understood as intending to provide for an expedited trial on the administrative record." Bannum, 404 F.3d at 1356.

The court reviews challenged agency actions pursuant to the standards set forth in the Administrative Procedure Act. 28 U.S.C. § 1491(b)(4) (2012). Specifically, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Under this standard, the court

> may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." A court reviews a challenge brought on the first ground "to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citations omitted) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001)); accord Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

Procurement officials "are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." Impresa, 238 F.3d at 1332 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of the Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). Thus, the court's review of a procuring agency's decision is "highly deferential." Advanced Data Concepts, 216 F.3d at 1058; see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) ("The court is not empowered to substitute its judgment for that of the agency."). Furthermore, a "protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater [in negotiated procurements] than in other types of bid protests." Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004). And, when a contract is to be awarded on a "best value" basis, procurement officials have "even greater discretion than if the contract were to have been awarded on the basis of cost alone." Id. (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.")).

After showing "a significant error in the procurement process," a protestor typically must show "that the error prejudiced it" in order to prevail. Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "[I]n a bid protest under the [Administrative Procedure Act, however,] prejudice is presumed when the Government acts irrationally." Caddell Constr. Co. v. United States, 125 Fed. Cl. 30, 50-51 (2016); accord Textron, Inc. v. United States, 74 Fed. Cl. 277, 329 (2006) (explaining that there is "no need to continue to prejudice" when "the

Government has acted arbitrarily and capriciously" because that "necessarily invalidates the procurement"); see also Impresa, 238 F.3d at 1333 (distinguishing between protests in which the offeror must show that the award decision was irrational and protests in which the offeror most show a prejudicial violation of a statute or regulation). If the protestor establishes a different type of error, then it must establish prejudice by showing that it possessed a substantial chance of receiving an award absent the alleged error. Banknote, 365 F.3d at 1350; see also Caddell, 125 Fed. Cl. at 50 ("[W]hen an irrational or arbitrary and capricious agency action has occurred, prejudice is presumed, but when a violation of statute or regulation has occurred, there must be a separate showing of prejudice").

### III. THE MERITS OF CITIZANT'S CLAIMS

Citizant protests the CO's decision to award contracts to various offerors. Specifically, Citizant argues that the CO erred when he (1) credited various offerors with the points they claimed for possessing an acceptable CAS, (2) found other offerors proposed reasonable pricing, (3) deemed two offerors responsible, and (4) awarded contracts to some offerors despite not identifying them as being eligible for an award in the SSD. Citizant further argues that each of those errors was prejudicial.

#### A. Cost Accounting System

#### 1. DUNS Number and CAGE Code

Citizant initially argued that the CO erred by crediting [. . .] and [. . .] with the points they each claimed for having an acceptable CAS despite the fact that they did not provide their DUNS number and CAGE code in volume 4. After defendant highlighted that both offerors included that information in a different section of their proposals, Citizant withdrew its argument concerning those offerors. See Tr. of Oral Arg. 25, Dec. 17, 2018.

#### 2. Audited and Adequate Determination

Citizant next argues that the CO erred by crediting [. . .] and [. . .] with the points they each claimed for having an acceptable CAS because they failed to provide evidence that their CASs were audited and found adequate. Specifically, Citizant asserts that those offerors' submission of a letter from the DCAA concerning their ICPs does not reflect that their CASs were audited or determined adequate for cost accounting. Defendant counters that [. . .] and [. . .] provided the necessary information in the DCAA letters they submitted because an ICP is submitted by a contractor performing a cost-reimbursement contract, and can only be used if the contractor's CAS has been deemed adequate.

Citizant is correct that the CO's determination is problematic. Relying solely on DCAA letters discussing the adequacy of [. . .] and [. . .] ICPs, the CO concluded that those offerors verified that they each possessed a CAS that the DCAA had audited and found adequate. Otherwise stated, he determined that the letters "unequivocally indicat[ed]" that those offerors' CASs were audited and determined adequate for cost reimbursement contracting by a CFA. AR 392 (outlining requirements for verification). His conclusion is irrational for two reasons. First,

the DCAA's review of an ICP is not unequivocal evidence that the contractor has an adequate CAS. The DCAA's assessment of an ICP is evidence that the contractor has an adequate CAS only if the ICP was submitted in connection with a cost-reimbursement contract.[14] See FAR 16.307(a)(1); see also FAR 16.301-3(a)(3); FAR 16.601. Because the type of contract associated with [. . .] and [. . .] ICPs is not evident from their respective proposals, the CO could not rely on the DCAA letters to conclude that those offerors possessed an adequate CAS.[15] Second, the DCAA letters do not indicate that [. . .] and [. . .] CASs were audited and found adequate by the DCAA or another CFA—as required by the solicitation—even if the ICPs were submitted in connection with a cost-reimbursement contract. A government contractor can receive a cost-reimbursement contract without having a CFA provide an audit-and-adequacy determination. See, e.g., FreeAlliance.com, LLC v. United States, 135 Fed. Cl. 71, 73-74 (2017). Indeed, the FAR is silent with respect to how a procuring agency must assess the adequacy of a CAS, see FAR 16.301-3(a)(3), and agencies have accepted materials other than a CFA audit-and-adequacy determination, see, e.g., FreeAlliance.com, 135 Fed. Cl. at 73-74 (describing a solicitation in which offerors could submit a determination from a Certified Public Accountant as evidence that they possessed an acceptable CAS).

In sum, the CO could not rationally conclude that the DCAA letters unequivocally indicated that [. . .] and [. . .] possessed a CAS that the DCAA (or another CFA) had audited and deemed adequate. He therefore acted arbitrarily and capriciously when he relied on the letters to validate the points those offerors claimed for maintaining an acceptable CAS.[16]

---

[14] With respect to assessing whether a contractor possesses an adequate CAS, the limited evidentiary value of an ICP is a function of the contract types that trigger a contractor's obligation to submit an ICP. An ICP must be submitted in connection with a cost-reimbursement contract or a time-and-materials contract. FAR 16.307(a)(1). The restrictions on those contracts are instructive here; a cost-reimbursement contract can only be awarded to a contractor with an adequate CAS, FAR 16.301-3(a)(3), but there is no similar limitation on the award of time-and-materials contracts, FAR 16.601. Thus, a contractor's submission of an ICP for a cost-reimbursement contract reflects that it has an adequate CAS, but the same conclusion cannot be drawn when the contractor submits an ICP in connection with a time-and-materials contract.

[15] Although the CO determined that the type of contract was evident from [. . .] and [. . .] letters concerning their ICPs, his conclusion reflects a misreading of the proposals and the law. Turning first to [. . .], the CO said that its DCAA letter was issued in connection with a cost-reimbursement contract, but neither the letter nor the remainder of [. . .] proposal indicate the associated contract type (or even identify the contract). As to [. . .], the CO's statement that the DCAA's review of [. . .] ICP is evidence that [. . .] was performing cost-reimbursement contracts reflects a misunderstanding of the law. See FAR 16.307(a)(1) (explaining that an ICP is submitted for a cost-reimbursement contract or time-and-materials contract).

[16] Even if the CO could not reasonably rely on the DCAA letters, defendant argues that the CO's decision to award the points to [. . .] and [. . .] was rational because those offerors satisfied the alternative method for validating points for a CAS—submitting a statement of certainty. But, as defendant acknowledges, the CO did not determine whether those offerors submitted a statement of certainty or make the requisite effort to contact the auditing agency.

### 3. Material Changes Averment

Citizant also argues that the CO improperly credited the Group One Offerors with the points they each claimed for having an acceptable CAS even though they each failed to submit the necessary statement averring that they had not materially changed their own CAS since it was last audited. Defendant counters that the CO (1) found the necessary averment in each offeror's BOE or (2) waived the requirement to submit a statement because the substance of the requisite representation was present in the BOE. Halvik, the defendant-intervenor, responds that it made the necessary averment in volume 1 as part of its meaningful commitment letter.

The CO's decision to award the Group One Offerors the points they each claimed for having an acceptable CAS is problematic for two reasons. First, the record reflects that the CO did not review whether the Group One Offerors made the necessary representation. Specifically, he reviewed the CAS component of offerors' proposals using an evaluation worksheet that did not contain a question concerning whether the offerors provided the required statement. Furthermore, he did not mention that requirement in the Technical Evaluation Summary when he recapped what points were validated or address the component in the materials created during the evaluation stage. Simply stated, the record contains no evidence even suggesting that the CO considered the requirement that an offeror certify that it had not made material changes to its CAS since its last audit. Second, the Group One Offerors did not submit the averment in the appropriate volume. The record reflects, and the parties do not dispute, that the Group One Offerors failed to include the necessary averment in volume 4. Thus, those offerors did not validate the points they claimed for possessing an acceptable CAS. The CO, therefore. acted arbitrarily and capriciously by awarding the Group One Offerors those points.

The court is not persuaded by defendant's argument that the CO found the necessary averment in the BOE that each Group One Offeror submitted in volume 6. First, as noted above, offerors needed to provide the statement in volume 4. Second, there is no evidence that the CO relied on the information in the BOE. Given these facts, defendant relies on its attorney's speculation that the CO awarded the points because, in the BOE, he found a functionally equivalent statement to the averment that needed to be in volume 4. But there is no record evidence to support that speculation.[17] See Health & Fitness, Inc. v. Strava, Inc., 849 F.3d 1034,

---

Simply stated, the CO's decision cannot be rationalized based on measures he did not contemplate and steps he did not take. See Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. W.L.L. v. United States, 56 Fed. Cl. 502, 508 (2003) (noting that post hoc rationalizations are of limited relevance).

[17] Defendant argues that the CO's intention to rely on information in the BOE is reflected by a question-and-answer exchange with an offeror that the CO conducted before the deadline for submitting proposals. The CO was asked whether "a letter from the DCAA with the results of [the offeror's] annual review/audit [was] acceptable documentation," and he responded, "clearly yes, if the letter satisfies the solicitation standards" addressing the requirements for validating points for a CAS. AR 460. But the CO did not suggest in his answer that he would rely on information in the BOE when evaluating whether an offeror submitted the necessary averment regarding its CAS. Moreover, there is no indication that he looked for the

1043 (Fed. Cir. 2017) ("Attorney argument is not evidence."); see also Al Ghanim, 56 Fed. Cl. at 508 (noting the limited value of post hoc rationalizations). Third, the CO still erred even if he could, and did, look beyond volume 4. The BOE in volume 6 is the only document that any of the parties have identified as potentially containing the necessary averment for each Group One Offeror with the exception of Halvik. But the CO could not rely on volume 6 when evaluating the technical components (such as whether an offeror validated its CAS). He could only review that volume after completing the technical evaluation, deducting any unsubstantiated points, and removing offerors with inadequate scores. See AR 403 (explaining that the CO would complete the technical evaluation before analyzing pricing). Otherwise stated, the CO would not know what an offeror wrote in the BOE when he was evaluating whether it made the required representation concerning its CAS. Thus, the purported presence of the averment in the BOE is of no import.

Halvik unpersuasively argues that the CO found its material change averment in its meaningful-commitment letter included in volume 1. But the statement needed to be in volume 4. Moreover, there is no evidence that the CO awarded the points based on what he reviewed in volume 1; Halvik's assertion that the CO relied on the letter is merely the argument of an attorney attempting to provide a rationale for a decision that the CO did not explain in the record. See Strava, 849 F.3d at 1043; Al Ghanim, 56 Fed. Cl. at 508.

Similarly unpersuasive is defendant's argument that the CO waived, pursuant to FAR 52.215-1, the material change averment requirement because he found the information in the BOE. Under FAR 52.215-1(f)(3), the CO can "waive minor informalities and minor irregularities" in proposals. Even assuming that the requirement to submit the no-material-changes statement in volume 4 could be waived, defendant relies on a faulty premise: the notion that the CO could look at volume 6 during the technical evaluation. Moreover, defendant fails to identify any record evidence suggesting that the CO waived the requirement. Thus, as with its previous argument, defendant is merely relying on attorney argument and speculation regarding why the CO awarded the points. That is not enough. See Strava, 849 F.3d at 1043; Al Ghanim, 56 Fed. Cl. at 508.

In sum, the CO acted arbitrarily and capriciously by awarding the Group One Offerors the points they each claimed for possessing acceptable CASs because they did not include the necessary material change averment in volume 4 of their proposals.

### B. Pricing

Citizant further argues that the CO erred when evaluating the Group Two Offerors' pricing. Citizant focuses on the CO's FAR 15.404-1(b)(2) analysis in which the CO assessed the fairness and reasonableness of offerors' proposed prices by comparing those amounts to the proposed rates submitted by other offerors. Specifically, Citizant asserts that the CO did not perform a proper comparison because he misidentified how often [. . .] and [. . .]—two of the Group Two Offerors—proposed rates outside the Deviation Range. Citizant also contends that

---

representation in the BOE when reviewing proposals even if his answer could be construed as reflecting an intention to do so.

the CO failed to conduct a meaningful or rational comparison when evaluating the Group Two Offerors' proposed prices.

### 1.  [. . .] and [. . .]

Citizant asserts that the CO failed to consider whether [. . .] proposed reasonable rates because he misstated how many fully burdened labor rates it proposed outside the Deviation Range.  The CO properly identified that [. . .] submitted four rates outside the range and listed those rates in a table, but he then twice indicated in his Cost/Price Analysis worksheet that [. . .]submitted forty-four rates outside the range when explaining why [. . .] rates were reasonable.  AR 10434.  Read in context, the CO's latter references to forty-four rates are merely typographical errors.  The presence of such mistakes does not suggest that the CO failed to independently analyze the rates, especially given that he specifically (and properly) identified the outlier rates in a table.  The court's conclusion is bolstered by the fact that the precise number of rates outside the Deviation Range was inconsequential to the CO's analysis.  See id. (finding the outliers were reasonable because they were derived from reasonable direct and indirect labor rates).

Citizant also contends that it is impossible to know which proposed rates the CO reviewed in [. . .] proposal because he said that it proposed one rate outside the Deviation Range and subsequently stated that there were two such rates.  As with its argument concerning [. . .], Citizant's focus on an apparent typographical error is unavailing.  The CO specified in a table what rates were outside the Deviation Range and concluded his analysis by noting that these "labor categories" were reasonable.  Id. at 10438 (emphasis added).  Citizant cannot feign confusion regarding what (or how many) rates the CO actually reviewed.  And, even if the specific rates could not be discerned, Citizant would not prevail because identifying which rates were outside the Deviation Range was not germane to the CO's analysis.  See id. (finding the outliers were reasonable because they were derived from reasonable direct and indirect rates).

### 2.  Group Two Offerors

Citizant next asserts that the CO improperly concluded that the Group Two Offerors proposed reasonable prices even though they did not provide a clear and convincing rationale for proposing fully burdened labor rates that were outside the Deviation Range.  The GSA, however, did not require offerors to provide such an explanation; offerors only needed to provide a rationale for direct labor rates that were not within the DOL Range.[18]  Indeed, offerors could not provide a rationale for proposing rates outside the Deviation Range because that range was calculated after proposals were submitted.

Citizant also contends that the CO erred because he did not explain what further consideration he gave to the Group Two Offerors' fully burdened labor rates that were outside

---

[18]  Although the GSA merely "advised" offerors proposing direct labor rates outside the DOL Range to provide a justification, the explanation was actually mandatory because an offeror was not eligible for an award if it proposed such rates without providing an acceptable rationale for its pricing.  AR 398.

the Deviation Range. This assertion is premised on the CO's statement in the Cost/Price Analysis worksheet—not a requirement stated in the solicitation—[. . .]. E.g., id. at 10425. Assuming that the CO's statement created an enforceable obligation, Citizant fails to demonstrate that the CO was required to explain how he further scrutinized the rates. Moreover, in his Cost/Price Analysis worksheet, the CO explained the additional consideration he gave to the rates. In contrast to the rates that he deemed reasonable because they were within the Deviation Range, the CO explained that the remaining rates were reasonable for different reasons. Specifically, the CO identified two important considerations: the offerors (1) applied the same static indirect labor rates to all CLINs and (2) used direct and indirect labor rates that were reasonable. Simply stated, the CO explained how he further analyzed the Group Two Offerors' rates that were outside the Deviation Range.

Although the CO explained how he compared rates, the CO's analysis of the Group Two Offerors' proposed fully burdened labor rates is problematic for three reasons. First, the CO did not evaluate the offerors' proposed pricing in a consistent manner. He used two different sets of averages and upper bounds of the Deviation Range when comparing offerors' proposed rates for a CLIN to the associated average and upper bound for that CLIN. Specifically, he used one set for reviewing [. . .] proposed pricing and a different set for the other offerors without explaining (or even acknowledging) the discrepancy. There is no rational basis for such disparate treatment.[19] Second, for offerors other than [. . .], the CO calculated an average and Deviation Range for each CLIN using rates proposed by an arbitrary group of offerors.[20] He derived those figures from the rates proposed by eighty-seven offerors; the CO excluded the rates proposed by some awardees, omitted the rates proposed by many of the offerors, and double counted the rates proposed by two offerors. The CO provided no justification, much less a rational justification, for how he selected the proposed rates to use in his averages. Third, the CO failed to provide a rational explanation for concluding that rates offerors proposed outside the Deviation Range were reasonable. For those outlier rates, he concluded that they were reasonable because the two inputs—indirect and direct labor rates—were reasonable. But it does not follow, as he assumed, that reasonable inputs per se lead to a reasonable output; indeed, an offeror who proposed high (but reasonable) direct and indirect labor rates could theoretically exceed the acceptable range for the fully burdened rate. In sum, the CO irrationally evaluated the Group Two Offerors' pricing.

### C. Prejudice

Because the CO erred when evaluating the proposals, the court proceeds to consider whether Citizant was prejudiced by those errors. The court presumes that Citizant was

---

[19] There is no indication in the record that the CO (1) retested [. . .] pricing against the figures he used for the other offerors, or (2) reevaluated the other offerors' pricing against the figures he used for [. . .].

[20] Unlike for the non-[. . .] offerors, the CO did not document how he calculated the averages and Deviation Ranges he used to assess [. . .] pricing. It is possible that the CO used equally arbitrary figures when assessing [. . .] pricing.

-16-

prejudiced because, as explained above, the record reflects multiple instances of the CO evaluating proposals in an arbitrary, capricious, or irrational manner. Accord Caddell, 125 Fed. Cl. at 50-51. Defendant and Halvik fail to address that presumption. Instead, defendant misconstrues the applicable burden by arguing that Citizant has not shown prejudice because it did not establish that a sufficient number of awardees would lose their contracts if the errors were corrected.[21] Thus, the presumption adopted by the court controls.

Even if the court did not presume prejudice, Citizant would still prevail because it has demonstrated that it had a substantial chance of receiving an award but for the CO's errors. Given the unique structure of this solicitation, there are two components to the substantial-chance inquiry. First, the court must determine whether there was anything in Citizant's proposal that would have precluded it from receiving a contract if its proposal score was among the eighty highest scores. If the CO would have disqualified Citizant after reviewing its pricing or responsibility—the two elements that he did not address during the underlying evaluation because Citizant was not among the highest scoring proposals—then Citizant cannot show it had a substantial chance of receiving an award. The court's review here is limited so as to not usurp the role of the CO in evaluating proposals. See John C. Grimberg Co. v. United States, 185 F.3d 1297, 1303 (Fed. Cir. 1999). Second, Citizant must show that, if the CO had properly evaluated proposals, there was a substantial likelihood that at least [. . .] awardees would not have qualified for contracts such that Citizant would be among the offerors who received a contract.

Citizant has established prejudice under the aforementioned test. First, the court finds no information in Citizant's pricing or responsibility volumes that would unequivocally disqualify it from receiving an award. Notably, defendant and Halvik do not assert that Citizant would have been disqualified for proposing unfair pricing or being found not responsible. Second, Citizant has shown errors—identified above—that are substantially likely to result in the removal of at least [. . .] awardees because they received credit for points to which they were not entitled (e.g., the Group One Offerors who were credited with having an acceptable CAS).[22] Moreover, Citizant has also shown a substantial chance of receiving an award because the CO will be required to reevaluate a significant number of awardees' proposals to remedy the errors noted above. Cf. Impresa, 238 F.3d at 1334 (determining that an offeror had shown a substantial chance of receiving an award when, as a result of the asserted errors, the procuring agency would have to rebid the contract). Simply stated, the court finds that Citizant has shown that it had a substantial chance of receiving a contract if the CO did not make the aforementioned errors.

---

[21] As indicated above, Citizant could only receive an award if at least [. . .] awardees lost their contracts because Citizant was the [. . .] highest scoring offeror in a solicitation that limited contracts to, except in the case of a tie for the last place, the eighty highest scoring offerors.

[22] Citizant would have a higher score than any of the Group One Offerors if they were not credited with the 5500 points they each claimed for possessing an adequate CAS. Compare, e.g., AR 10227 (reflecting that Citizant was credited with [. . .] points), with id. at 469 (documenting that [. . .], a Group One Offeror, received [. . .] points).

## IV.  THE RELIEF REQUESTED BY CITIZANT

Citizant requests injunctive relief and attorney's fees.  In accordance with 28 U.S.C. § 1491(b)(2), "[t]o afford relief" in a bid protest, the United States Court of Federal Claims "may award any relief that [it] considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs."  Accord Turner Constr. Co. v. United States, 645 F.3d 1377, 1388 (Fed. Cir. 2011) (holding that "once jurisdiction attaches [under 28 U.S.C. § 1491(b)], the Court of Federal Claims has broad equitable powers to fashion an appropriate remedy").

### A.  Injunctive Relief

Citizant seeks an injunction requiring the GSA to (1) correct the errors noted above, (2) re-sort the proposals in accordance with the solicitation, and (3) award Citizant a contract. As an initial matter, the court cannot direct the government to award a contract to a specific offeror.  CCL Serv. Corp. v. United States, 43 Fed. Cl. 680, 688 (1999) ("Selection of a contractor among the protestors and award of the contract are improper exercises of the court's authority.").  The court, however, can entertain Citizant's request for other injunctive relief and does so with the knowledge that, during a status conference on March 8, 2019, defendant stated that it did not object to the court awarding injunctive relief.

When determining whether to award a permanent injunction, the court must consider whether (1) Citizant has succeeded on the merits, (2) Citizant will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships favors the grant of injunctive relief, and (4) injunctive relief is in the public interest.  PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).  Citizant bears the burden of establishing the factors by a preponderance of the evidence.  Lab. Corp. of Am. Holdings v. United States, 116 Fed. Cl. 643, 654 (2014).  None of the four factors, taken individually, is dispositive, and a "weakness of the showing regarding one factor may be overborne by the strength of the others."  FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993).[23]

After reviewing the record, the parties' briefing, and their representations,[24] the court concludes that Citizant has established by a preponderance of the evidence that each of the factors noted above weigh in favor of an injunction.  Thus, the court grants Citizant's request for a permanent injunction.

---

[23]  Although FMC Corp. concerns the award of a preliminary injunction, 3 F.3d at 427, "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success," Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n.12 (1987).

[24]  Citizant provided a declaration to support its contention that it will be irreparably harmed without an injunction.

### B. Attorney's Fees

Citizant's request for attorney's fees is not yet ripe for adjudication because it has yet to make the necessary application under the Equal Access to Justice Act. See 28 U.S.C. § 2412(d)(1). See generally Universal Fid. LP v. United States, 70 Fed. Cl. 310 (2006) (discussing the process for obtaining attorney's fees following a successful bid protest). The court will look favorably upon such an application.

### V.   CONCLUSION

For the reasons discussed above, the court **DENIES** defendant's motion for judgment on the administrative record, **DENIES** Halvik's motion for judgment on the administrative record, and **GRANTS** Citizant's motion for judgment on the administrative record. Citizant is entitled to injunctive relief. Specifically, the court **ENJOINS** the GSA from proceeding with the current awardee list and **DIRECTS** the GSA to reevaluate the proposals in a manner that redresses the errors addressed above. The clerk shall enter judgment accordingly.

The court has filed this ruling under seal. The parties shall confer to determine proposed redactions to which all the parties agree. Then, by **no later than Friday, March 22, 2019,** the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge